Beth S. Brinkmann (SBN 129937)**
bbrinkmann@cov.com
Alexander A. Berengaut*
aberengaut@cov.com
Megan C. Keenan*
mkeenan@cov.com
COVINGTON & BURLING LLP
850 Tenth Street, NW
Washington, DC 20001
Telephone: +1 (202) 662-6000
Facsimile: + 1 (202) 778-6000

John E. Hall (SBN 118877)
jhall@cov.com
Anders Linderot*
alinderot@cov.com
COVINGTON & BURLING LLP
620 Eighth Avenue
New York, New York 10018-1405
Telephone: +1 (212) 841-1000
Facsimile: + 1 (212) 841-1010

Mitchell A. Kamin (SBN 202788)
mkamin@cov.com
Benjamin G. Cain (SBN 325122)**
bcain@cov.com
COVINGTON & BURLING LLP
1999 Avenue of the Stars, Suite 3500
Los Angeles, California 90067-4643
Telephone: + 1 (424) 332-4800
Facsimile: + 1 (424) 332-4749

*Attorneys for Plaintiffs*

*Pro hac vice application forthcoming*
**C.D. California admission forthcoming*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| TIKTOK INC. and BYTEDANCE LTD., | Case No. 2:20-cv-7672 |
| Plaintiffs, | **COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States; WILBUR L. ROSS, JR., in his official capacity as Secretary of Commerce; and U.S. DEPARTMENT OF COMMERCE, | |
| Defendants. | |

Plaintiffs TikTok Inc. and ByteDance Ltd., for their Complaint against Defendants DONALD J. TRUMP, in his official capacity as President of the United States; WILBUR L. ROSS, JR., in his official capacity as Secretary of Commerce; and the U.S. DEPARTMENT OF COMMERCE; allege as follows:

## INTRODUCTION

1.     This action seeks to prevent the government from impermissibly banning TikTok, a mobile software application that 100 million Americans use to create and share short videos composed of expressive content.  On August 6, 2020, President Trump issued an executive order banning this communication and information-sharing platform, without affording its owners—Plaintiffs TikTok Inc. and ByteDance Ltd.—due process of law and for political reasons rather than because of an "unusual and extraordinary threat" to the United States, which is a condition for the President to exercise his authority under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701–1706.  The President's executive order is unconstitutional and *ultra vires*, and must be enjoined.

2.     IEEPA vests the President with significant power to prohibit certain transactions to protect U.S. national security.  Past presidents have used this power responsibly to protect the country from genuine threats from abroad, including terrorism and the proliferation of weapons of mass destruction.  Through this executive order, however, President Trump seeks to use IEEPA against TikTok Inc., a *U.S. company*—headquartered in Los Angeles with hundreds of employees across the United States—to destroy an online community where millions of Americans have come together to express themselves, share video content, and make connections with each other.  The order imposes these restrictions despite express limitations in IEEPA barring executive actions from restricting personal communications or the transmission of informational materials.  The order also sweeps broadly to ban any transactions with TikTok Inc.'s parent company, ByteDance, even though the purported justification for the order is limited to the

TikTok mobile application ("TikTok"), which is just one of ByteDance's several businesses.  The order is thus a gross misappropriation of IEEPA authority and a pretext for furthering the President's broader campaign of anti-China rhetoric in the run-up to the U.S. election.

3.     The executive order seeks to ban TikTok purportedly because of the speculative possibility that the application could be manipulated by the Chinese government.  But, as the U.S. government is well aware, Plaintiffs have taken extraordinary measures to protect the privacy and security of TikTok's U.S. user data, including by having TikTok store such data outside of China (in the United States and Singapore) and by erecting software barriers that help ensure that TikTok stores its U.S. user data separately from the user data of other ByteDance products. These actions were made known to the U.S. government during a recent U.S. national security review of ByteDance's 2017 acquisition of a China-based company, Musical.ly.  As part of that review, Plaintiffs provided voluminous documentation to the U.S. government documenting TikTok's security practices and made commitments that were more than sufficient to address any conceivable U.S. government privacy or national security concerns—even going so far as to be prepared to spin-out the U.S. TikTok business to trusted American investors.

4.     Ignoring these demonstrable facts and commitments, President Trump's executive order authorizes the Secretary of Commerce to prohibit "any transaction" with ByteDance and its subsidiaries, including banning TikTok from operating in the United States.  It is revealing that the President's order took no account of the national security review process involving the Committee on Foreign Investment in the United States ("CFIUS" or "the Committee") that was still pending at the time of the executive order.  Instead, the order was issued abruptly after the President had proclaimed in a campaign-style news conference that TikTok Inc. had "no rights" and that he would ban TikTok if Plaintiffs did not pay money to the U.S. Treasury to secure the U.S. government's approval for any sale.  The President stated

that he would use his IEEPA authority to force TikTok to "close down" unless it is acquired through "an appropriate deal" in which "the Treasury . . . of the United States gets a lot of money."[1]

5.    The executive order and, necessarily, any implementing regulations are unlawful and unconstitutional for a number of independent reasons:

- By banning TikTok with no notice or opportunity to be heard (whether before or after the fact), the executive order violates the due process protections of the Fifth Amendment.

- The order is *ultra vires* because it is not based on a bona fide national emergency and authorizes the prohibition of activities that have not been found to pose "an unusual and extraordinary threat."

- The order is *ultra vires* because its prohibitions sweep broadly to prohibit any transactions with ByteDance, although the purported threat justifying the order is limited to TikTok, just one of ByteDance's businesses.

- The order is *ultra vires* because it restricts personal communications and the transmission of informational materials, in direct violation of IEEPA.

- IEEPA lacks any intelligible principle to guide or constrain the President's action and thereby violates the non-delegation doctrine, as the President's overbroad and unjustified claim of authority in this matter confirms.

- By demanding that Plaintiffs make a payment to the U.S. Treasury as a condition for the sale of TikTok, the President has taken Plaintiffs' property without compensation in violation of the Fifth Amendment.

- By preventing TikTok Inc. from operating in the United States the

---

[1] Fadel Allassan, *Trump says TikTok will be banned if not sold by Sept. 15, demands cut of sale fee*, Axios (Aug. 3, 2020), https://www.axios.com/trump-tiktok-banned-microsoft-fd45748d-1ee8-4f4a-812a-09ec76d6f8e2.html.

executive order violates TikTok Inc.'s First Amendment rights in its code, an expressive means of communication.

6. Accordingly, ByteDance and TikTok Inc. seek a declaratory judgment and order invalidating and enjoining the executive order and any implementing regulations issued by the Department of Commerce.[2]

## JURISDICTION AND VENUE

7. The Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the United States Constitution and the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701–1706.

8. The Court has authority to grant declaratory and injunctive relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*; 5 U.S.C. § 702; and the Court's inherent equitable powers.

9. Venue is proper in this district pursuant to 28 U.S.C. § 1391(e)(1), because officers or employees of agencies of the United States acting in their official capacities and an agency of the United States are defendants, because Plaintiff TikTok Inc. has its principal place of business in this district, and because a substantial part of the events or omissions giving rise to this action occurred in this district.

## PARTIES

### A. Plaintiffs

10. Plaintiff TikTok Inc. is a company incorporated in California, with its principal place of business in Culver City, California.

11. Plaintiff ByteDance Ltd. ("ByteDance") is a global company incorporated in the Cayman Islands, with offices in the United States, China, Singapore, the United Kingdom, and India, among others. ByteDance owns and

---

[2] The order tasks the Department of Commerce with identifying the specific transactions to be banned by September 20, 2020, and with adopting rules and regulations as may be necessary to implement the order. Plaintiffs intend to amend this complaint pursuant to Fed. R. Civ. P. 15(a)(1)(A) and move for a preliminary injunction after the regulations are issued.

operates a variety of mobile software applications that enable people around the world to connect with, consume, and create entertainment content, including TikTok.  ByteDance also owns and operates other applications that are available in the United States, such as CapCut, a video editing application, and Lark, a collaboration and communications software product.

**B.    Defendants**

12.    Defendant Donald J. Trump is the President of the United States. President Trump made the decision to ban TikTok and issue the August 6, 2020 executive order, purportedly acting under authority of IEEPA.

13.    Defendant Wilbur T. Ross, Jr. is the Secretary of Commerce and is sued in his official capacity.  President Trump's executive order tasks Secretary Ross with identifying the transactions subject to the order and authorizes him to implement the order through regulations.

14.    The Department of Commerce is the cabinet department of the federal government responsible for implementing the executive order.

## FACTUAL ALLEGATIONS

**I.    TikTok's Global Success Has Resulted From Private-Sector Entrepreneurial Innovation.**

15.    TikTok is an inclusive communication platform for making and sharing short-form videos through the TikTok mobile application.  It encourages users to celebrate what makes them unique, while finding a community that does the same. TikTok Inc.'s mission is to inspire creativity and bring joy.  It strives to build a global community, in which users can create and share authentically, discover the world around them, and connect with others across the globe.[3]

16.    The TikTok application enables users to create and upload short videos that are fifteen seconds to one minute in duration.  In this respect, TikTok operates

---

[3] TikTok, *Our Mission*, https://www.tiktok.com/about?lang=en (last visited Aug. 21, 2020).

much like other digital application platforms such as Snapchat, YouTube, and Instagram, in that users create and post content on the platform. TikTok offers features such as background music and augmented reality effects, but users control which features to pair with the content of their self-directed videos, and TikTok serves as a host for the content created by its users.

17. The TikTok application began as a product of private-sector entrepreneurship. In 2012, 29-year-old entrepreneur Yiming Zhang founded TikTok Inc.'s parent corporation, ByteDance. ByteDance is owned by Zhang and a number of major global institutional investors based in the United States, including Sequoia, General Atlantic, Coatue, and SIG. No foreign government, or person controlled by or acting on behalf of a foreign government, owns any significant interest or any other affirmative or negative rights or powers in ByteDance.

18. Since founding ByteDance, Zhang has developed multiple products and services, including TikTok, many of which are operated through subsidiaries and affiliates—such as TikTok Inc. in the United States. TikTok is not offered in China, where ByteDance operates a similar but separate video-sharing platform called Douyin.

19. TikTok's user base has grown at a rapid pace in the United States. By January 2018, TikTok had 11,262,970 U.S. monthly active users. By February 2019, TikTok's base more than doubled, with a total of 26,739,143 U.S. monthly active users. By October of that same year, TikTok's total number of U.S. monthly active users had climbed to 39,897,768. And by June 2020, TikTok's total number of U.S. monthly active users had soared to 91,937,040. Today, based on quarterly usage, 100 million Americans use the TikTok application.

20. TikTok's growth in the United States paralleled its expansion worldwide. By January 2018, TikTok had 54,793,729 global monthly active users. By December of that year, TikTok had 271,188,301 global monthly active users. And one year later, in December 2019, TikTok had 507,552,660 global monthly

active users.  As of July 2020, TikTok had 689,174,209 global monthly active users, and by August 2020, TikTok surpassed two billion global downloads.

21.    As a result of its rapid growth and success, TikTok has become available in more than 200 countries, and it currently has approximately 50 million daily active users in the United States.  TikTok has grown largely because of its appeal to those who value the blend of light entertainment, creativity, and humor that the application provides.

22.    TikTok is also used by its users to discuss more serious subjects, including political issues.  "Society's struggles are on full display in TikTok," including in the many posts about "the tragic death of George Floyd[,] LGBTQ awareness[,] and tributes to healthcare workers [] who are on the frontlines of COVID-19."[4]  As of August 24, 2020, TikTok users had amassed approximately 6.8 million views of posts with the hashtag #RIPJohnLewis, 230.3 million views of posts about #Juneteenth, and 20.3 billion views of posts about #BlackLivesMatter.[5] Prominent TikTok users like Sarah Cooper have attracted millions of views based on posts that satirize the President, as have posts with hashtags such as #MakeAmericaGreatAgain and #BuildThatWall.[6]  And TikTok users claimed they used TikTok to coordinate mass ticket reservations for the President's re-election

---

[4] Gene Del Vecchio, *TikTok Is Pure Self-Expression. This Is Your Must-Try Sampler.*, Forbes (June 6, 2020), https://www.forbes.com/sites/genedelvecchio/2020/06/06/tiktok-is-pure-self-expression-this-is-your-must-try-sampler/#4e40f1f15a09.

[5] TikTok, *#RIPJohnLewis*, https://www.tiktok.com/tag/RIPJohnLewis?lang=en (last visited Aug. 24, 2020); TikTok, *#Juneteenth*, https://www.tiktok.com/tag/Juneteenth?lang=en (last visited Aug. 24, 2020); TikTok, *#BlackLivesMatter*, https://www.tiktok.com/tag/BlackLivesMatter?lang=en (last visited Aug. 24, 2020).

[6] Charles Trepany, *Who is Sarah Cooper? Viral Trump Impersonator appears at DNC, bags TV specials*, USA Today (Aug. 20, 2020), https://www.usatoday.com/story/entertainment/celebrities/2020/07/21/trump-impersonator-sarah-cooper-reflects-viral-social-media-stardom/5483534002/; TikTok, *#MakeAmericaGreatAgain*, https://www.tiktok.com/tag/MakeAmericaGreatAgain?lang=en (last visited Aug. 23, 2020) (approximately 104.5 million views); TikTok, *#BuildThatWall*, https://www.tiktok.com/tag/BuildThatWall?lang=en (last visited Aug. 23, 2020).

1  campaign rally in Tulsa, which inflated projected attendance in the days leading up
2  to the event.[7]  Several American politicians are verified users on TikTok, including
3  Governor Michael DeWine of Ohio, Senator Ed Markey of Massachusetts, Governor
4  Gavin Newsom of California, and Senator Bernie Sanders of Vermont.

5       23.    TikTok is an economic lifeline for many of its users, especially during
6  the COVID-19 pandemic.  TikTok has given rise to new, non-traditional social
7  media celebrities—"many of them working-class folks . . . in villages far from []
8  cosmopolitan megacities"—and has become "a livelihood for some people,"
9  providing "fame, empowerment and even a path out of poverty."[8]

10 **II.    TikTok Has Implemented Safeguards to Help Protect the Privacy and**
11 **Security of U.S. User Data.**

12      24.    Maintaining a safe and supportive environment for its users is a critical
13 priority for Plaintiffs.  TikTok's business model rests on the principle that a safe
14 environment is essential to helping people feel comfortable with expressing
15 themselves openly and creatively.  Plaintiffs also aim to cultivate an environment
16 for authentic interactions by working to keep deceptive content and accounts off
17 TikTok.

18      25.    TikTok has been structured to help protect the privacy and security of
19 U.S. user data.  Those protections begin with TikTok's practices in collecting user
20 data.  TikTok collects limited data from its users in accordance with its privacy
21 policy.[9]  For user data that is collected, TikTok prioritizes its secure storage.  The
22 current version of TikTok made available in the United States (*i.e.*, the version

23 ───────────────
24 [7] Taylor Lorenz et al, *TikTok Teens and K-Pop Stans Say They Sank Trump Rally*, N.Y. Times (July 11, 2020), https://www.nytimes.com/2020/06/21/style/tiktok-trump-rally-tulsa.html.

25 [8] Sushmita Pathak, *'TikTok Changed My Life': India's Ban On Chinese App Leaves*
26 *Video Makers Stunned*, NPR (July 16, 2020), https://www.npr.org/2020/07/16/890382893/tiktok-changed-my-life-india-s-ban-on-chinese-app-leaves-video-makers-stunned.
27

28 [9] TikTok, *Privacy Policy* (last updated Jan. 1, 2020), https://www.tiktok.com/legal/privacy-policy?lang=en.

principally affected by Defendant's unlawful ban and the version on which this complaint focuses) stores all U.S. user data on servers in the United States and Singapore, where it is segregated from data relating to other ByteDance products and services by software-based controls. TikTok does not store any U.S. user data in China.

26.    While it is in storage, the following U.S. user data is currently encrypted using the industry-standard key management service ("KMS") encryption algorithm (AES 256 GCM), which is operated by TikTok's U.S. security team: names, birthdays, home addresses, phone numbers, emails, passwords, PayPal account information, contact list, private videos, direct messages, and certain fields of the log-in history.

27.    The KMS algorithm also generates secret keys required to access encrypted data, and these keys are managed by the U.S. security team, under the control and direction of Roland Cloutier, the U.S.-based Global Chief Security Officer. ByteDance's China-based engineering personnel supporting TikTok may access these encrypted data elements in decrypted form based on demonstrated need and if they receive permission under the Data Access Approval Process, which is managed by TikTok's U.S.-based team.

28.    TikTok has additional internal controls in place to prevent keys that decrypt U.S. user data from being accessed by ByteDance personnel without authorization from the U.S. security team. TikTok regularly conducts code audits and internal reviews of access to data to help ensure that no unauthorized access to U.S. user data takes place, and it has not identified any purposeful breach of security controls.

29.    In addition to its storage security practices, TikTok takes steps to secure and encrypt user data while it is being transmitted. TikTok currently uses Hypertext Transfer Protocol Secure ("HTTPS") by default for transmission of user data in the United States, the same industry-standard protocol used by major U.S. banks and

1  e-commerce platforms to secure their online transactions.

2      30.    TikTok is committed to continually strengthening its data privacy

3  policies to protect its users, to maintain sponsors' trust, and to comply with

4  applicable legal and regulatory standards.  TikTok regularly reviews its security

5  protections to identify and remediate any potential vulnerabilities.  This is part of a

6  mature software development lifecycle program that involves both automatic and

7  manual review of security controls at multiple points in the development process.

8  TikTok also has a vulnerability reporting policy that invites security researchers to

9  disclose information about vulnerabilities,[10] and it relies on respected American

10  third-party vendors to validate its security controls and help ensure that U.S. user

11  data is not subject to security vulnerabilities.

12      31.    In addition to safeguarding TikTok user data against data breaches,

13  hackers, and other malicious actors, TikTok has security controls designed to protect

14  the integrity of its source code.  For example, employees must demonstrate a need

15  for information before they can access TikTok source code.  Even upon a showing

16  of such a need, the employee still must obtain appropriate authorization to access the

17  source code, and security controls embedded in the network monitor the employee's

18  review and activities.  TikTok has also repeatedly engaged internal engineers and

19  third-party vendors to perform quality and security checks and conduct intensive

20  code reviews to help ensure that no back doors exist in TikTok's source code.

21      32.    TikTok has reinforced its commitment to prioritizing the privacy and

22  security concerns of U.S. users by placing U.S.-based executives in key leadership

23  positions that shape the direction of the company.  TikTok is led by a senior

24  management team located in the United States.  Its Chief Executive Officer, General

25  Manager, Global Chief Security Officer, U.S. Head of Safety, and General Counsel

---

27  [10] TikTok, *Report Security Vulnerabilities*, https://support.tiktok.com/en/privacy-
safety/reportsecurityvulnerabilities-default#:~:text=Coordinated%20Disclosure%
28  20Policy%20as%20defined,submission%2C%20whichever%20is%20sooner.%22.

are all U.S.-based persons.   These U.S.-based leaders came to TikTok from leadership positions in prominent U.S. companies like the Walt Disney Company, ADP, YouTube, and Microsoft.[11]

33.    TikTok Inc. has broadened its commitment to hiring U.S. personnel beyond the highest levels of leadership as well, including by hiring dozens of highly qualified individuals with experience at leading U.S. technology companies.   TikTok has also established a fully staffed content moderation team in the United States to oversee all content moderation decisions for U.S. users.   And Plaintiffs have announced plans to add approximately 10,000 jobs in the United States over the next three years.[12]

34.    TikTok's U.S.-based leadership team has consistently stressed its commitment to prioritizing U.S. data privacy and security.[13]  Most recently, on July 29, 2020, TikTok announced the launch of its Transparency and Accountability Center for moderation and data practices, which will enable experts to "observe our moderation policies in real-time, as well as examine the actual code that drives our algorithms."   As the announcement explained, this act of transparency is unparalleled by other major social media companies and "puts [TikTok] a step ahead of the industry."[14]

35.    As these efforts reflect, Plaintiffs are committed to appropriately safeguarding U.S. user data against unauthorized access from outside the United

---

[11] Brooks Barnes & Jack Nicas, *Disney's Head of Streaming Is New TikTok C.E.O.*, N.Y. Times (May 18, 2020), https://www.nytimes.com/2020/05/18/business/media/tiktok-ceo-kevin-mayer.html.

[12] Reuters, *TikTok plans to add 10,000 jobs in U.S. over next three years* (July 21, 2020), https://www.reuters.com/article/us-tiktok-jobs/tiktok-plans-to-add-10000-jobs-in-u-s-over-next-three-years-idUSKCN24M1S9.

[13] Vanessa Pappas, *Explaining TikTok's approach in the US*, TikTok (Nov. 5, 2019), https://newsroom.tiktok.com/en-us/explaining-tiktoks-approach-in-the-us.

[14] Kevin Mayer, *Fair competition and transparency benefits us all*, TikTok (July 29, 2020), https://newsroom.tiktok.com/en-us/fair-competition-and-transparency-benefits-us-all.

States—including by any foreign government.  TikTok is not and has never been offered in China.  There is no connection between TikTok and the Chinese government.  Nor does the Chinese government exert any control over TikTok Inc. through its parent company, ByteDance.  The key personnel responsible for TikTok, including its CEO, Global Chief Security Officer, and General Counsel, are all Americans based in the United States—and therefore are not subject to Chinese law.  U.S. content moderation is likewise led by a U.S.-based team and operates independently from China, and, as noted above, the TikTok application stores U.S. user data on servers located in the United States and Singapore.

36.    Neither TikTok Inc. nor ByteDance provides TikTok user data to the Chinese government, and the Chinese government has never asked for data on TikTok users or to moderate TikTok content.  Plaintiffs would reject any such request.

**III.    Plaintiffs Proactively Engaged with the U.S. Government and Sought to Address Any Conceivable National Security Concerns.**

37.    As the foregoing reflects, as TikTok has grown, it has continued to refine and strengthen its data privacy protections and has done so voluntarily, reflecting its ongoing commitment to U.S. users.  As part of these efforts, Plaintiffs have also sought proactively to engage with the U.S. Government to anticipate and address any concerns it might have.  These efforts have included responding separately and diligently to inquiries from CFIUS.

38.    CFIUS is the regulatory body tasked with reviewing foreign acquisitions of U.S. businesses to determine their impact on national security. CFIUS reviews transactions to identify and address any unresolved national security concerns they might pose to the United States.  If CFIUS identifies such a risk that cannot be adequately and appropriately addressed by other legal authorities, the Committee or a lead agency may, on behalf of the Committee, negotiate, enter into or impose, and enforce any agreement or condition with any party to the covered

transaction in order to mitigate any risk to the national security of the United States that arises as a result of the covered transaction. Under its governing statute, CFIUS may refer a transaction to the President if CFIUS is unable to identify adequate and appropriate mitigation, *i.e.*, mitigation measures that it believes (a) can successfully address the identified risk, (b) allow for verifiable compliance, and (c) can be effectively monitored and enforced, consistent with the requirements of 50 U.S.C. § 4565(l)(3)(C). The President is ultimately empowered to prohibit covered transactions that pose threats to national security that cannot be adequately and appropriately addressed through other authorities.

39. In 2019, CFIUS contacted ByteDance to consider whether to review its acquisition of Musical.ly, a China-based video-sharing platform—even though Musical.ly was based in China and had very limited assets in the United States. This review was highly unusual in that ByteDance had acquired Musical.ly two years earlier in 2017, Musical.ly was previously Chinese-owned and based in China, and ByteDance had predominantly abandoned Musical.ly's limited U.S. assets by the time of CFIUS's outreach in 2019. Nevertheless, in March 2020, after months of evaluating its jurisdiction, CFIUS advised ByteDance that it intended to conduct a formal review of the acquisition of Musical.ly, and on June 15, 2020, CFIUS initiated that review. This lengthy deliberation by a U.S. government institution comprised of national security professionals simply underscores that, in fact, there was no national emergency in relation to TikTok or ByteDance's acquisition of Musical.ly.

40. The Musical.ly acquisition did not affect—let alone undermine—TikTok Inc.'s commitments to the security and privacy of its U.S. user data, nor did it create any national security concerns. In fact, after acquiring Musical.ly in 2017, ByteDance and TikTok migrated Musical.ly users to TikTok and, as noted above, effectively abandoned the Musical.ly code, brand, and business. And since the Musical.ly acquisition, ByteDance and TikTok Inc. have sought to base more of the

1    TikTok business, including the user data, in the United States.

2        41.    CFIUS nevertheless initiated a review of the Musical.ly acquisition,

3    following, as noted, a lengthy period of evaluating whether there was a basis for such

4    a review.   During this period, and through the course of the CFIUS review,

5    ByteDance provided voluminous documentation and information in response to

6    CFIUS's questions.    Among other evidence, ByteDance submitted detailed

7    documentation to CFIUS demonstrating TikTok's security measures to help ensure

8    U.S. user data is safeguarded in storage and in transit and cannot be accessed by

9    unauthorized persons—including any government—outside the United States.

10        42.    CFIUS never articulated any reason why TikTok's security measures

11    were inadequate to address any national security concerns, and effectively

12    terminated formal communications with Plaintiffs well before the conclusion of the

13    initial statutory review period.   Notwithstanding the U.S. government's failure to

14    identify any security risk, in an effort to address any conceivable concerns that the

15    U.S. government may have and to assure continuity for the U.S. users who had come

16    to value and cherish the platform that TikTok provides, Plaintiffs took the

17    extraordinary step of offering to restructure their U.S. business.   From the middle

18    through the end of July 2020, ByteDance proposed various mitigation plans to the

19    U.S. Treasury Department (which chairs CFIUS), including spinning out TikTok's

20    U.S. business to American investors and/or trusted U.S. technology partners that

21    would be responsible for maintaining and operating TikTok in the United States.   On

22    July 30, 2020, Plaintiffs also notified CFIUS that ByteDance had signed a non-

23    binding Letter of Intent (LOI) with Microsoft Corporation contemplating that,

24    among other things, Microsoft could acquire the U.S. TikTok business and could

25    serve as the trusted technology partner for TikTok's U.S. business.

26        43.    Despite these repeated efforts and concrete proposals to alleviate any

27    national security concerns, the agency record reflects that CFIUS repeatedly refused

28    to engage with ByteDance and its counsel about CFIUS's concerns.

-14-

44.     At 11:55 p.m. on July 30, 2020—the final day of the statutory CFIUS review period—the Committee issued a letter stating that "CFIUS has identified national security risks arising from the Transaction and that it has not identified mitigation measures that would address those risks."

45.     The CFIUS letter was principally based on outdated news articles, failed to address the voluminous documentation that Plaintiffs had provided demonstrating the security of TikTok user data, and was flawed in numerous other respects.  Most conspicuously, the Letter entirely failed to substantively address the actual mitigation proposals that were on the table—namely, ByteDance's willingness to restructure its U.S. business.

## IV.     Defendants Have Banned TikTok Without Providing Plaintiffs Due Process of Law.

### A.     Purporting to Act Under IEEPA, the President Issued an Extraordinary Executive Order Banning TikTok That Was Not Based on Any Bona Fide National Security Concern.

46.     On August 6, 2020, notwithstanding ByteDance's ongoing good-faith efforts to pursue reforms and restructuring of the TikTok U.S. business, President Trump took the unprecedented step of issuing the executive order challenged here, entitled "Addressing the Threat Posed by TikTok."[15]   The President took this extraordinary step without affording Plaintiffs any notice or opportunity to engage in relation to any of the points raised in the order, all of which are speculative and not based on actual facts, as described below.

47.     The executive order cites the International Emergency Economic Powers Act (50 U.S.C. § 1701 *et seq.*) ("IEEPA"), the National Emergencies Act (50 U.S.C. § 1601 et seq.), and 3 U.S.C. § 301 as the legal authority for issuing the

---

[15] White House, *Executive Order on Addressing the Threat Posed by TikTok* (Aug. 6, 2020), https://www.whitehouse.gov/presidential-actions/executive-order-addressing-threat-posed-tiktok/.  The August 6 executive order was numbered 13942 and published in the Federal Register at 85 Fed. Reg. 48637.

order.

48.     IEEPA grants the President authority to regulate various international economic transactions during wartime or upon declaration of a national emergency "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States."   50 U.S.C. § 1701(a).   Before the President is empowered to exercise authority under IEEPA, the President must first declare a national emergency for purposes of the National Emergencies Act, 50 U.S.C. § 1601 *et seq.* ("NEA").

49.     Previous administrations have used IEEPA to impose sanctions on foreign states like Iran and North Korea, or individuals who have been placed on the Specially Designated Nationals and Blocked Persons List published by the U.S. Treasury Department's Office of Foreign Assets Control, because of the sanctioned entity's participation in terrorist activities or human rights abuses.   These uses of IEEPA have provided important protection against such external threats as international terrorism and the proliferation of weapons of mass destruction.   The use of IEEPA to ban TikTok, however, marks a dramatic break from past practices.

50.     On its face, the executive order fails to identify any unusual and extraordinary threat posed by TikTok—or any *actual* national security threat at all.   Rather, the order makes various unsubstantiated assertions to support its purported findings, as follows:

- "[TikTok's] data collection threatens to allow the Chinese Communist Party access to Americans' personal and proprietary information — *potentially* allowing China to track the locations of Federal employees and contractors, build dossiers of personal information for blackmail, and conduct corporate espionage."
- TikTok "also *reportedly* censors content that the Chinese Communist Party deems politically sensitive, such as content concerning protests

in Hong Kong and China's treatment of Uyghurs and other Muslim minorities."

- TikTok "*may* also be used for disinformation campaigns that benefit the Chinese Communist Party, such as when TikTok videos spread debunked conspiracy theories about the origins of the 2019 Novel Coronavirus."[16]

51.    As its equivocal language telegraphs, the executive order provides absolutely no evidence for any of its self-described findings.  The order cites no evidence that TikTok enables the Chinese government to track any U.S. persons, nor does the order substantiate its allegations regarding TikTok's supposed censorship or its use as a platform for disinformation.  It also fails to take account of any of the voluminous documentation provided to CFIUS, which details TikTok's policies, procedures, and operational teams in place to safeguard against precisely these hypothetical concerns.  While IEEPA does not require a risk to fully materialize before the President may invoke its authorities, it cannot be—and is not—the case that the statute permits the President to rely on such unfounded speculation.

52.    The order uses such equivocal language because, in fact, TikTok does none of these things:  TikTok has made it clear, through its actions and statements, that it shares no information with the Chinese government and will never do so—a conclusion reportedly shared by the CIA, which found "no evidence" that Chinese intelligence services have ever accessed data from TikTok.[17]  TikTok also has a mature content moderation program designed to provide a safe forum for its users, and one that does not censor content to advance the political—or any other— objectives of any government, including the Chinese government.  And, there is

---

[16] *Id.* (emphasis added).

[17] Rachel Sandler, *CIA Finds 'No Evidence' Chinese Government Has Accessed TikTok Data, Report Says*, Forbes (Aug. 8, 2020), https://www.forbes.com/sites/ rachelsandler/2020/08/07/cia-finds-no-evidence-chinese-government-has-accessed-tiktok-data-report-says/#13f3fbaa4c25.

absolutely zero evidence that TikTok has ever been used to spread disinformation or conspiracy theories for any government.

53.     Instead of identifying any threats related to TikTok, the executive order draws upon the previously declared "national emergency with respect to the information and communications technology and services supply chain declared in Executive Order 13873 of May 15, 2019 (Securing the Information and Communications Technology and Services Supply Chain)."

54.     That previous executive order was designed to address asserted U.S. national security concerns about Chinese telecommunications companies.  It found that "foreign adversaries are increasingly creating and exploiting vulnerabilities in information and communications technology and services, which store and communicate vast amounts of sensitive information, facilitate the digital economy, and support critical infrastructure and vital emergency services, in order to commit malicious cyber-enabled actions, including economic and industrial espionage against the United States and its people," and that the use of these information and communications technology and services "constitutes an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States."[18]

55.     President Trump's August 6 order targeting TikTok purports to draw upon the national emergency established in Executive Order 13873, and newly declares that "the spread in the United States of mobile applications developed and owned by companies in the People's Republic of China" (China) continues to threaten the national security, foreign policy, and economy of the United States," and that "action must be taken to address the threat posed by one mobile application in particular, TikTok."[19]

---

[18] White House, *Executive Order on Securing the Information and Communications Technology and Services Supply Chain* (May 15, 2019), https://www.whitehouse.gov/presidential-actions/executive-order-securing-information-communications-technology-services-supply-chain/.

[19] White House, *Executive Order on Addressing the Threat Posed by TikTok* (Aug.

56.   The order then prohibits "any transaction by any person, or with respect to any property, subject to the jurisdiction of the United States, with ByteDance Ltd. (a.k.a. Zìjié Tiàodòng), Beijing, China, or its subsidiaries, in which any such company has any interest, as identified by the Secretary of Commerce," and declares that the prohibition will take effect starting 45 days after the issuance of the order, which is on September 20, 2020.  The covered transactions will be identified by the Secretary of Commerce on September 20, 2020, the same day the order goes into effect.[20]

57.   The executive order thus goes far beyond merely banning TikTok, and instead prohibits "any transactions" involving its parent company, ByteDance.  The executive order imposes this sweeping restriction even though TikTok is just one of ByteDance's several businesses and despite the fact that the purported findings set out in the executive order are limited only to TikTok.

58.   While the full scope of the executive order will remain unknown until the Secretary of Commerce identifies the covered transactions on September 20, 2020, the order itself poses an existential threat to TikTok's U.S. business. Depending on the definition of prohibited transactions, when the ban goes into effect, it could wipe out Plaintiffs' entire TikTok business by preventing TikTok from attracting new users; by driving current users to competing platforms; and by destroying TikTok's ability to partner with other companies and attract and retain employees.  Some of these harms have already materialized and will only accelerate once the Commerce Department specifies the scope of prohibited transactions. Plaintiffs intend to move for a preliminary injunction to enjoin this irreparable harm once the Commerce Department issues its regulations and the full scope of the unlawful executive order's impact is understood.

---

6,   2020),   https://www.whitehouse.gov/presidential-actions/executive-order-addressing-threat-posed-tiktok/.

[20] *Id.*

**B.    The President Has Also Imposed Conditions on Plaintiffs' Efforts to Divest the TikTok U.S. Business.**

59.    Despite these devastating economic consequences caused by the executive order, Plaintiffs have persisted in their efforts to follow through on their restructuring proposals.

60.    Meanwhile, President Trump has acted to impose additional conditions on any sale. _First_, on August 3, 2020, President Trump stated: "A very substantial portion of th[e purchase] price is going to have to come into the Treasury of the United States. Because we're making it possible for this deal to happen. Right now they don't have any rights, unless we give it to them. So if we're going to give them the rights, it has to come into this country."[21]  The President added that TikTok will "close down on September 15 unless Microsoft or somebody else is able to buy it and work out a deal—an appropriate deal. So the Treasury of the—really, the Treasury . . . of the United States gets a lot of money. A lot of money. Okay?"[22]

61.    The President elaborated on this condition on August 19, 2020, after other potential buyers reportedly expressed interest in acquiring TikTok. When asked whether he would "prefer Oracle to Microsoft," the President responded: "Well, I guess Microsoft wants it and so does Oracle, and probably so do other people. But they have to also make sure the United States is well compensated because we're the ones making it possible. Very simple: We're the ones making it possible. So our Treasury has to be very well compensated. . . . You have to put money into the Treasury."[23]

---

[21] Fadel Allassan, _Trump says TikTok will be banned if not sold by Sept. 15, demands cut of sale fee_, Axios (Aug. 3, 2020), https://www.axios.com/trump-tiktok-banned-microsoft-fd45748d-1ee8-4f4a-812a-09ec76d6f8e2.html.

[22] Jason Murdock, _Trump Demanding Cut From Microsoft TikTok Sale Akin to 'Extortion,' Critics Say_, Newsweek (Aug. 4, 2020), https://www.newsweek.com/tiktok-microsoft-sale-president-donald-trump-extortion-1522597.

[23] White House, _Remarks by President Trump During Border Wall Construction and Operational Update | Yuma, AZ_ (Aug. 18, 2020), https://www.whitehouse.gov/

62. _Second_, on August 14, 2020, the President accepted CFIUS's recommendation and issued an executive order titled "Regarding the Acquisition of Musical.ly by ByteDance Ltd."[24]  The CFIUS order asserts without explanation that there is "credible evidence that leads me to believe that ByteDance Ltd. . . . might take action that threatens to impair the national security of the United States," and based on this finding, the order prohibits "ownership by ByteDance of any interest in Musical.ly in the United States, whether effected directly or indirectly through ByteDance, or through ByteDance's subsidiaries, affiliates, or Chinese shareholders."[25]

63. The President ignored the mitigation efforts by TikTok Inc. and ByteDance and imposed a strict timeline for the company to do something it has already offered to do:  the CFIUS order mandates that, within 90 days (or 120 days, if CFIUS chooses to provide a 30-day extension), ByteDance, its subsidiaries, affiliates, and Chinese shareholders must "divest all interests and rights in: (i) any tangible or intangible assets or property, wherever located, used to enable or support ByteDance's operation of the TikTok application in the United States, as determined by the Committee; and (ii) any data obtained or derived from TikTok application or Musical.ly application users in the United States."[26]

64. This lawsuit challenges the President's August 6 executive order issued under IEEPA.  However, the CFIUS process and the President's August 14 order emanating from the CFIUS process provide important context for the August 6 order—for example, Plaintiffs' mitigation proposals made during the CFIUS process

---

briefings-statements/remarks-president-trump-border-wall-construction-operational-update-yuma-az/?utm_source=link.

[24] White House, _Order Regarding the Acquisition of Musical.ly by ByteDance Ltd_ (Aug. 14, 2020), https://www.whitehouse.gov/presidential-actions/order-regarding-acquisition-musical-ly-bytedance-ltd/ (the "CFIUS order").  The CFIUS order was published in the Federal Register at 85 Fed. Reg. 51295.

[25] _Id._

[26] _Id._

undercut the rationale for not only the August 14 CFIUS executive order, but also the President's August 6 IEEPA executive order.

**V.    The Background and Timing of the Executive Order Plainly Suggest That It Was Designed Not for a Bona Fide National Security Reason But Instead to Further the President's Anti-China Political Campaign.**

65.    The President's actions clearly reflect a political decision to campaign on an anti-China platform.  As the 2020 election approaches, President Trump has consistently referred to COVID-19 as the "Wuhan virus," "China virus," and "Kung Flu," despite previous public statements by officials in his own administration that such terms were "highly offensive" and "hurtful."[27]

66.    At his Tulsa campaign rally on June 20, 2020, for example, the President deployed the term "Kung Flu" in discussing COVID-19, and added: "China sent us the plague, thank you very much."[28]  On July 14, 2020, the President returned to the theme, stating that "[n]o administration has been tougher on China than this administration," including by "hold[ing] China fully responsible for concealing the virus and unleashing it upon the world."[29]

67.    On July 30, 2020, the President again blamed China for the COVID-19 pandemic.  When asked a question about providing unemployment insurance to workers impacted by the COVID-19 pandemic, the President responded:  "The fact

[27] David Nakamura, *With 'kung flu,' Trump sparks backlash over racist language — and a rallying cry for supporters*, Wash. Post (June 24, 2020), https://www.washingtonpost.com/politics/with-kung-flu-trump-sparks-backlash-over-racist-language--and-a-rallying-cry-for-supporters/2020/06/24/485d151e-b620-11ea-aca5-ebb63d27e1ff_story.html.

[28] Rev Services, *Donald Trump Tulsa, Oklahoma Rally Speech Transcript* (June 21, 2020), https://www.rev.com/transcript-editor/shared/QejgrzxQ6qkjA0Za9-pjLFZS5ZdV1-9FJlVhEDgD__iryMlzWNTuiXG75Z31YksXxLelVlbkViOTbhfk9W8LHVRjYLo?loadFrom=PastedDeeplink&ts=3769.

[29] White House, *Remarks by President Trump in Press Conference* (July 14, 2020), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-press-conference-071420/.

is, people don't like saying it — they know it's true:  It's China's fault.  Okay?"[30]

68.    The next day, on July 31, 2020, the President elaborated on his anti-China rhetoric.  The President said that voters "love Trump on trade. . . . Look at what we did with China, we took in tens of billions of dollars.  And before the plague came in, we were doing so great, we were doing better than any country has ever done.  We were beating China at every level. . . . They were having the worst year and we were having the best year we have ever had."  Before introducing the other speakers, he ended the first portion of his speech by saying:  "We will make America great again, you've heard that before. . . . And we were there until the virus came upon us and we'll soon be there again. And China, we have not forgotten."[31]

69.    The President's re-election campaign has recently run online advertisements targeting TikTok, asking supporters to "sign the petition now to ban TikTok."[32]  President Trump and his campaign's targeting of TikTok follows a recent political episode, noted above, involving TikTok, in which TikTok users claimed that they used the application to coordinate mass ticket reservations and inflate projected attendance for the President's campaign rally in Tulsa.[33]

---

[30] White House, *Remarks by President Trump in Press Briefing* (July 30, 2020), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-press-briefing-july-30-2020/.

[31] CSPAN, *President Trump Remarks to Florida Sheriffs* (July 31, 2020), https://www.c-span.org/video/?474419-1/president-trump-remarks-florida-sheriffs.

[32] John D. McKinnon & Shan Li, *TikTok Could Be Tougher Target for Trump Administration*, Wall St. J. (July 26, 2020), https://www.wsj.com/articles/tiktok-could-be-tougher-target-for-trump-administration-11595755800; Kari Soo Lindberg, *Trump Campaign Urges Supporters to Back TikTok Ban in Online Ads*, Bloomberg News (July 18, 2020), https://www.bloomberg.com/news/articles/2020-07-18/trump-campaign-urges-supporters-to-back-tiktok-ban-in-online-ads.

[33] Taylor Lorenz et al, *TikTok Teens and K-Pop Stans Say They Sank Trump Rally*, N.Y. Times (July 11, 2020), https://www.nytimes.com/2020/06/21/style/tiktok-trump-rally-tulsa.html; Kari Soo Lindberg, *Trump Campaign Urges Supporters to Back TikTok Ban in Online Ads*, Bloomberg News (July 18, 2020), https://www.bloomberg.com/news/articles/2020-07-18/trump-campaign-urges-supporters-to-back-tiktok-ban-in-online-ads.

## VI.   The Opinions of Independent Experts Underscore the Lack of Any Bona Fide National Security Justification for the Executive Order.

70.   The executive order is not rooted in bona fide national security concerns.   Independent national security and information security experts have criticized the political nature of this executive order, and expressed doubt as to whether its stated national security objective is genuine.   For example, Steven Weber, a cybersecurity expert who currently serves as Associate Dean and Head of UC Berkeley School of Information, has stated that, "[i]n this political environment between the United States and China, you're guilty until proven innocent if you're a Chinese company."[34]   Weber recognizes that, "[i]n theory, any app that collects users data (in other words, essentially every app) could be a national security risk," but his view "is that the issue here isn't really about TikTok; it's about the overall deterioration in Sino-American relations."[35]   He stressed that this anti-China focus has been borne out by the Trump administration's recent actions:   "This week the villain is TikTok, last month it was Zoom, and before that Huawei."[36]   In this sense, the executive order marks a continuation of what Michael Wessel, a commissioner on the US-China Economic and Security Review Commission, has called "an inappropriate conflation of two different policy goals—trade and national security."[37]

---

[34] UC Berkeley School of Information, *Steve Weber Says Geopolitical Tensions to Blame for Rising Fear in TikTok Security* (July 15, 2020), https://www.ischool.berkeley.edu/news/2020/steve-weber-says-geopolitical-tensions-blame-rising-fear-tiktok-security.

[35] UC Berkeley School of Information, *Steve Weber Says Fed's Targeting of TikTok Related to Worsening US-China Relations* (July 13, 2020), https://www.ischool.berkeley.edu/news/2020/steve-weber-says-feds-targeting-tiktok-related-worsening-us-china-relations.

[36] *Id.*

[37] Clare Duffy, *Trump said he'd ease up on Huawei. Questions remain about what that means*, CNN Business (July 5, 2019), https://www.cnn.com/2019/07/03/tech/trump-huawei-restrictions/index.html.

-24-

71.     Justin Sherman, fellow at the Atlantic Council's Cyber Statecraft Initiative, has similarly observed that "as soon as a Chinese company is in the news, all of a sudden that becomes the new target" for the Trump administration."[38]  And Cybersecurity Policy and China Digital Economy Fellow Samm Sacks has stated that such a ban "sets a dangerous precedent in which the U.S. government can blacklist companies based on country of origin using blanket national security as justification."[39]

72.     Former U.S. government officials have also explained that the Trump administration's handling of the CFIUS investigation involving ByteDance's acquisition of Musical.ly is well outside the bounds of normal national security investigations.  Former officials such as American Enterprise Institute scholar Derek Scissors, a self-identified "China hawk," have described the "chaos" and "politicization" of the CFIUS review—"including Trump's loud involvement"—as "botched" and "unprecedented in the history of the nearly 50-year-old panel."[40]

73.     The executive order is especially unprecedented in light of the extraordinary mitigation proposed by Plaintiffs—a divestiture of TikTok's U.S. operations to trusted U.S. owners who have experience and expertise to maintain the privacy and security of U.S. user data—which would completely address any conceivable national security concerns.  But instead of taking seriously Plaintiffs' efforts at mitigation as required by statute, the Trump administration failed to propose modifications or even respond to the proposed mitigation solutions.  The President then threatened to take executive action against ByteDance and TikTok

---

[38] CNN, *TikTok is a national security threat, US politicians say. Here's what experts think* (July 9, 2020), https://wtop.com/cyber-security/2020/07/tiktok-is-a-national-security-threat-us-politicians-say-heres-what-experts-think/.

[39] Samm Sacks, *Banning TikTok is a terrible idea*, SupChina (July 16, 2020), https://supchina.com/2020/07/16/banning-tiktok-is-a-terrible-idea/.

[40] Emily Birnbaum, *'This has been botched': This is what makes Trump's TikTok tirade so unusual*, Protocol (Aug. 6, 2020), https://www.protocol.com/cfius-tiktok-not-how-this-works.

Inc. unless they pursued a divestiture—the very spin-out restructuring solution that Plaintiffs had previously proposed as mitigation—but with one additional condition: that the Treasury Department receive "a lot of money."  The President's demands for payments have no relationship to any conceivable national security concern and serve only to underscore that Defendants failed to provide Plaintiffs with the due process required by law.

**<u>CLAIMS FOR RELIEF</u>**

**Count 1:  The Executive Order Violates the Due Process Clause of the Fifth Amendment**

74.    Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth in this count.

75.    The Fifth Amendment to the U.S. Constitution provides:  "No person shall . . . be deprived of life, liberty, or property, without due process of law[.]"  U.S. Const. amend. V.  The Due Process Clause of the Fifth Amendment requires that parties deprived of their property receive adequate notice and an opportunity to be heard.  *Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976).

76.    TikTok Inc., as a U.S. entity, is unquestionably entitled to the protections of the due process clause.  *N. Sec. Co. v. United States*, 24 S. Ct. 436, 444 (1904) ("Corporations are persons within the meaning of the constitutional provision forbidding the deprivation of property without due process of law, as well as a denial of the equal protection of the laws.").  And ByteDance, as a foreign entity that has substantial connections with and holds property located in the United States, is entitled to those protections as well.  *See Nat'l Council of Resistance of Iran v. Dept. of State*, 251 F.3d 192, 203 (D.C. Cir. 2001) (foreign organizations that have "entered the territory of the United States and established substantial connections with this country . . . are entitled to the protections of the Constitution."); *Russian Volunteer Fleet v. United States*, 282 U.S. 481, 491–92 (1931) (foreign organization that acquires or holds property in the U.S. may invoke the protections of the Constitution when that property is placed in jeopardy by government intervention).

77.    The executive order deprives TikTok Inc. and ByteDance of their property rights by allowing the Secretary of Commerce to prohibit "any transaction" by any person, or with respect to any property, subject to U.S. jurisdiction, with ByteDance, TikTok Inc., or any of ByteDance's other subsidiaries.  Although the

exact breadth of Plaintiffs' deprivation will remain uncertain until Defendants define the covered transactions on September 20, 2020, the order plainly contemplates a profound deprivation of Plaintiffs' property rights, regardless of how broadly or narrowly Defendants choose to implement it.

78.     In the specific context of IEEPA, due process requires that Plaintiffs be informed of the reasons for the executive order, so that they may have an adequate ability to respond in a meaningful way.  *Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury*, 686 F.3d 965, 1001 (9th Cir. 2012) (holding that Treasury's Office of Foreign Assets Control violated organization's due process rights by "failing to provide an adequate statements of reasons for its investigation" under IEEPA).

79.     To date, Plaintiffs have received no notice or opportunity to respond to the deprivation contemplated in the order, and the order provides for no such opportunity for Plaintiffs to respond before or after the order takes effect.  Instead, the order facially contemplates that the government will not notify Plaintiffs of which transactions are covered by the order until the same day the order takes effect and deprives them of their rights.

80.     The executive order is thus unconstitutional because it deprives Plaintiffs of their property rights without adequate due process.

81.     Defendants' due process violations will cause ongoing irreparable harm to Plaintiffs.

**Count 2:  The Executive Order is *Ultra Vires* Because It Is Not Based on a Bona Fide National Emergency. (50 U.S.C. §§ 1701–1706)**

82.     Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth in this count.

83.     IEEPA grants the President authority to regulate various international

economic transactions during wartime or upon declaration of a national emergency "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States."  50 U.S.C. § 1701(a).

84.    Before the President is empowered to exercise authority under IEEPA, the President must first declare a national emergency for purposes of the NEA, 50 U.S.C. § 1601 *et seq*.

85.    On May 15, 2019, President Trump declared that "the unrestricted acquisition or use in the United States of information and communications technology or services designed, developed, manufactured, or supplied by persons owned by, controlled by, or subject to the jurisdiction or direction of foreign adversaries augments the ability of foreign adversaries to create and exploit vulnerabilities in information and communications technology or services, with potentially catastrophic effects, and thereby constitutes an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States." *See* Executive Order 13873 (Securing the Information and Communications Technology and Services Supply Chain).

86.    In his August 6 executive order targeting TikTok, President Trump drew upon the emergency declared in Executive Order 13873, asserting that "additional steps must be taken to deal with the national emergency with respect to the information and communications technology and services supply chain," and that, "[a]t this time, action must be taken to address the threat posed by one mobile application in particular, TikTok."

87.    But the actions directed in the August 6 executive order are not supported by the emergency declared a year earlier in Executive Order 13873.

88.    That previous executive order was designed to address asserted U.S. national security concerns about certain telecommunications companies' ability to abuse access to "information and communications technology and services" that

"store and communicate vast amounts of sensitive information, facilitate the digital economy, and support critical infrastructure and vital emergency services, in order to commit malicious cyber-enabled actions, including economic and industrial espionage against the United States and its people."

89.   TikTok Inc. is not a telecommunications provider and it does not provide the types of technology and services contemplated by the 2019 executive order.   Specifically, TikTok Inc. does not provide the hardware backbone to "facilitate the digital economy," and TikTok Inc. has no role in providing "critical infrastructure and vital emergency services."   Rather, TikTok Inc. is a social media company, and the TikTok mobile application is a software platform on which users express their views and opinions in short form video.

90.   Apart from its misplaced reliance on Executive Order 13873, the order also fails on its face to identify *any actual threat* that TikTok poses to the national security of the United States.   As noted above, the order states, without any explanation and in direct conflict with the voluminous agency record of TikTok's robust data security practices, that TikTok (i) engages in data collection practices that "*potentially* allow[] China" to make use of U.S. user data for nefarious purposes, (ii) "*reportedly* censors content," and (iii) "*may* be used for disinformation campaigns." [41]   These speculative assertions, made without any evidentiary foundation, do not constitute a bona fide national emergency.

91.   The executive order is accordingly *ultra vires* because it is not based on a bona fide national "emergency" as that term was used by Congress.   The text of IEEPA requires that an "emergency" be an "unusual and extraordinary threat."   50 U.S.C. § 1701(a).   The legislative history of IEEPA makes clear that emergencies within the meaning of the statute are "rare and brief" as opposed to "normal, ongoing problems."   *See* Revision of Trading With the Enemy Act: Markup Before the H.

---

[41] White House, *Executive Order on Addressing the Threat Posed by TikTok* (Aug. 6, 2020), https://www.whitehouse.gov/presidential-actions/executive-order-addressing-threat-posed-tiktok/ (emphasis added).

Comm. on Int'l Relations, 95th Cong. 4 (1977).

92.    Because President Trump issued the executive order targeting Plaintiffs for political and strategic purposes pertaining to his political campaign, and not to deal with an "unusual and extraordinary threat" to the national security, foreign policy, or the economy of the United States, the executive order is *ultra vires*.

93.    Defendants' *ultra vires* violation will cause ongoing irreparable harm to Plaintiffs.

**Count 3:  The Executive Order is *Ultra Vires* Because Its Prohibitions Are Broader Than the Purported Unusual or Extraordinary Threat Invoked by the President.**
**(50 U.S.C. §§ 1701–1706)**

94.    Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth in this count.

95.    The President's authority under IEEPA "may only be exercised to deal with an unusual and extraordinary threat . . . and may not be exercised for any other purpose."  50 U.S.C. § 1701(b).

96.    Even if the executive order did deal with an "unusual and extraordinary threat," the order by its very terms identifies that threat as being posed "by one mobile application in particular, TikTok."  The President made no findings as to ByteDance or any of its subsidiaries other than TikTok Inc. and did not declare a national emergency related to those entities.

97.    The executive order, however, is not limited to TikTok Inc., the U.S. entity, or the TikTok application.  Instead, the order prohibits "any transaction . . . with ByteDance Ltd. . . . or its subsidiaries, in which any such company has an interest . . . ."  The order thus, by its very terms, goes far beyond the purported threat identified by the President and beyond the scope of any executive action that could reasonably be needed to deal with that threat.

98.    Because the purported threat, even taken at face value, is limited to

TikTok "in particular," the order's ban on any transactions with ByteDance or its subsidiaries is plainly overbroad to the extent that it authorizes the Secretary of Commerce to prohibit transactions related to ByteDance more broadly, including its other applications that are available in the United States, such as the video-editing application CapCut and the communications software Lark.  The prohibitions authorized by the text of the order wholly fail to distinguish TikTok from ByteDance's other U.S. products and services.

99.   The executive order is therefore *ultra vires* because it authorizes the prohibition of activities that have not been found to be an unusual and extraordinary threat, as required by IEEPA.

100.   Defendants' *ultra vires* violation will cause ongoing irreparable harm to Plaintiffs.

**Count 4: The Executive Order is *Ultra Vires* Because It Restricts Personal Communications and the Transmission of Informational Materials in Violation of IEEPA (50 U.S.C. §§ 1701–1706)**

101.   Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

102.   The authority granted to the President under IEEPA "does not include the authority to regulate or prohibit, directly or indirectly . . . any postal, telegraphic, telephonic, or other personal communication, which does not involve a transfer of anything of value."  50 U.S.C. § 1702(b)(1).

103.   A separate "informational materials exception" protects the import and export of "any information or informational materials, including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds," regardless "of format or medium of transmission," so long as the materials are not independently controlled for export through operation of specified regulations.  *Id.*

§ 1702(b)(3).

104.  The TikTok application transmits and stores both personal communications and informational materials within the meaning of IEEPA.

105.  By purporting to ban the TikTok application in the United States, the executive order necessarily restricts personal communications and the transmission of informational materials.

106.  The executive order is therefore *ultra vires* because it authorizes the prohibition of activities that are expressly carved out from the President's authorities under IEEPA.

107.  Defendants' *ultra vires* violation will cause ongoing irreparable harm to Plaintiffs.

### Count 5:  IEEPA Violates the Non-Delegation Doctrine

108.  The U.S. Constitution provides for separation of powers between the branches of our government to avoid excessive concentration of power in any single branch.  The Constitution vests legislative power in the Congress, executive power in the President, and judicial power in the courts, U.S. Const., arts. I–III, and it limits the delegation of those powers to any other branch.

109.  Congress can delegate its legislative functions to another branch only if "Congress has supplied an intelligible principle to guide the delegee's use of discretion."  *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019).

110.  In enacting IEEPA, Congress delegated legislative authority to the President, empowering the President to declare a national emergency and take action "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States."  50 U.S.C. § 1701.

111.  The ambiguity and breadth of President Trump's executive order highlights that the President's ability to invoke a national emergency under IEEPA is so open-ended that Congress has not supplied an "intelligible principle" to guide

Executive Branch decision-making authority.  *Gundy*, 139 S. Ct. at 2123.  Instead, Congress's passage of IEEPA has in practice amounted to "merely announc[ing] vague aspirations and then assign[ing] others the responsibility of adopting legislation to realize its goals."  *Id.* at 2133  (Gorsuch, J., dissenting).  Such an expansive delegation of authority runs afoul of core constitutional values of accountability and the separation of powers.

112.   The lack of any intelligible principle to guide or constrain the President's action is manifest in the TikTok executive order, which purports to ban a U.S. company based in part on the content of the communications transmitted on its platform and without any bona fide national security basis.  This overbroad exercise of authority confirms that the statute has become "nothing more than the will of the current President."  *Id.* at 2135 (Gorsuch, J., dissenting).

113.   The executive order is accordingly unconstitutional because IEEPA violates the non-delegation doctrine.

114.   President Trump's unconstitutional exercise of IEEPA authority will cause ongoing irreparable harm to Plaintiffs.

**Count 6: The Executive Order Violates the Takings Clause of the Fifth Amendment**

115.   Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth in this count.

116.   The Takings Clause provides that private property shall not "be taken for public use, without just compensation."  U.S. Const. amend. V.

117.   The President has repeatedly made demands for a "very substantial" payment to the U.S. Treasury Department as a condition of approving a divestiture of TikTok Inc.'s U.S. assets and has made clear that, in the absence of such a

1    divestiture and payment, he would ban TikTok.[42]

2    118.   There is no conceivable regulatory basis for such a demand—or for the

3    executive order's destruction of Plaintiffs' business more generally—and this

4    unjustifiable   economic   deprivation   interferes   with   Plaintiffs'   legitimate

5    investment-backed expectations.  *See Penn Cent. Transp. Co. v. City of New York*,

6    438 U.S. 104, 124 (1978).

7    119.   Defendants have accordingly violated the Takings Clause of the Fifth

8    Amendment.

9    120.   Defendants' taking in violation of the Fifth Amendment will cause

10   ongoing irreparable harm to Plaintiffs, for which there is no adequate remedy at law.

11   **Count 7: The Executive Order Violates the First Amendment Right to Free**

12   **Speech.**

13   121.   Plaintiffs reallege and incorporate by reference all prior paragraphs of

14   this Complaint and the paragraphs in the counts below as though fully set forth in

15   this count.

16   122.   By preventing TikTok from operating in the United States, the

17   executive order violates Plaintiffs' First Amendment rights in and to its code.

18   123.   "Like music and mathematical equations, computer language is just

19   that, language, and it communicates information either to a computer or to those who

20   can read it."  *Bernstein v. U.S. Dep't of State*, 922 F. Supp. 1426, 1435–36 (N.D.

21   Cal. 1996); *Green v. U.S. Dep't of Justice*, 392 F. Supp. 3d 68, 86 (D.D.C. 2019).

22   "Because computer source code is an expressive means for the exchange of

23   information and ideas about computer programming[,] it is protected by the First

24   Amendment."  *Junger v. Daley*, 209 F.3d 481, 485 (6th Cir. 2000).

25   124.   "As computer code—whether source or object—is a means of

26   expressing ideas, the First Amendment must be considered before its dissemination

27   ─────────────────────

28   [42] Fadel Allassan, *Trump says TikTok will be banned if not sold by Sept. 15, demands cut of sale fee*, Axios (Aug. 3, 2020), https://www.axios.com/trump-tiktok-banned-microsoft-fd45748d-1ee8-4f4a-812a-09ec76d6f8e2.html.

may be prohibited or regulated," *Universal City Studios, Inc. v. Reimerdes*, 111 F. Supp. 2d 294, 326–27 (S.D.N.Y. 2000), regardless of whether the executive order targets TikTok because of its content or the order has only an incidental effect on TikTok Inc.'s speech.  Only "the *scope* of the protection for computer code depends upon whether the restriction on the code is because of its content," not the fact of protection itself.  *321 Studios v. Metro Goldwyn Mayer Studios, Inc.*, 307 F. Supp. 2d 1085, 1099–100 (N.D. Cal. 2004) (emphasis added); *see also Junger*, 209 F.3d at 484.

125.   The executive order facially burdens TikTok Inc.'s speech for both functional and content-based reasons.  The order specifically justifies targeting TikTok based in part on the content of the videos hosted on TikTok, citing concerns about videos on "politically sensitive" topics and videos about the "origins of the 2019 Novel Coronavirus."

126.   The contemplated scope of the order—banning any transactions with TikTok Inc. and ByteDance, and, according to the President's statements, forcing TikTok to "close down" altogether—is "greater than essential to the furtherance" of any government interest underlying the order.  *321 Studios*, 307 F. Supp. 2d at 1100. The vast majority of TikTok videos could not reasonably be construed to in any way relate to national security, nor is its user data more susceptible to collection by Chinese authorities than from any number of other sources.

127.   The overbroad nature of the order is readily apparent in light of Plaintiffs' extraordinary proposals to restructure the U.S. TikTok business, which would address any purported national security concerns asserted in the executive order.

128.   Because the executive order is broader than necessary to serve any governmental interest, the order violates TikTok Inc.'s First Amendment rights.

129.   Defendants' violation of TikTok Inc.'s First Amendment rights will cause ongoing irreparable harm to Plaintiffs.

## **REQUESTED RELIEF**

WHEREFORE, Plaintiffs pray that this Court grant the following relief:

(1)     Issue a declaratory judgment pursuant to 28 U.S.C. § 2201(a) that the August 6, 2020 executive order (No. 13942) is unlawful and unconstitutional;

(2)     Issue an order invalidating the August 6, 2020 executive order (No. 13942), preliminarily and permanently enjoining Defendants from implementing or enforcing the August 6, 2020 executive order (No. 13942), and preserving the status quo;

(3)     Grant any other and further relief that this Court may deem just and proper.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

DATED: August 24, 2020

Respectfully submitted,


_/s John E. Hall_                    .

Beth S. Brinkmann (SBN 129937)**
Alexander A. Berengaut*
Megan C. Keenan*
COVINGTON & BURLING LLP
Washington, DC
One CityCenter
850 Tenth Street, NW
Telephone: +1 (202) 662-6000
Facsimile: + 1 (202) 778-6000
Email:  bbrinkmann@cov.com
          aberengaut@cov.com
          mkeenan@cov.com

John E. Hall (SBN 118877)
Anders Linderot*
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018-1405
Telephone: +1 (212) 841-1000
Facsimile: + 1 (212) 841-1010
Email:  jhall@cov.com
          alinderot@cov.com

Mitchell A. Kamin (SBN 202788)
Benjamin G. Cain (SBN 325122)**
COVINGTON & BURLING LLP
1999 Avenue of the Stars, Suite 3500
Los Angeles, California 90067-4643
Telephone: + 1 (424) 332-4800
Facsimile: + 1 (424) 332-4749
Email:  mkamin@cov.com
          bcain@cov.com

*Attorneys for Plaintiffs*

*Pro hac vice application forthcoming
**C.D. California admission
forthcoming*